## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JEFFERY S. GUITON,        )
                                   )
          Plaintiff,     )
                                   )
     v.                  )       1:08CV822
                                   )
MICHAEL J. ASTRUE,        )
Commissioner of Social     )
Security,               )
                                   )
          Defendant.     )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Jeffery S. Guiton, brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"). The Court has before it the certified administrative record and the parties have filed cross-motions for judgment.

## PROCEDURAL HISTORY

Plaintiff applied for DIB on July 31, 2000, alleging a disability onset date of June 19, 2000. (Tr. 89-91.) In an initial determination dated August 24, 2000, Defendant found Plaintiff disabled within the meaning of the Act as of his alleged onset date. (Tr. 50.) However, on October 15, 2003, Defendant

determined that Plaintiff's disability ceased on October 1, 2003, and that his entitlement to DIB would end December 31, 2003. (Tr. 55-57.) After a disability hearing officer affirmed this decision on August 23, 2004, Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. 62-73, 76-87.)

A hearing before an ALJ took place on November 9, 2005. (Tr. 445-81.) The ALJ determined that Plaintiff was not disabled under the Act. (Tr. 422-37). The Appeals Council denied Plaintiff's request for review (Tr. 438-40) and he appealed to this Court (Tr. 441-44). In a consent order, the Court (per Chief Judge James A. Beaty, Jr.) reversed the decision and remanded the case to Defendant for further proceedings. (Tr. 482-84.) The ALJ held a second hearing on October 17, 2007, attended by Plaintiff, his attorney, and a vocational expert ("VE"). (Tr. 610-49.) By decision dated September 11, 2008, the ALJ again found Plaintiff not disabled. (Tr. 9-36).

In rendering that disability determination, the ALJ made the following findings, which Defendant adopted:

1.   The most recent favorable medical decision finding that the claimant was disabled is the determination dated August 24, 2000.  This is known as the "comparison point decision" or CPD.

2.   At the time of the CPD, the claimant had the following medically determinable impairment:  a malignant brain tumor.   This impairment was found to meet the requirements of Section 11.05A of 20 C.F.R. Part 404, Subpart P, Appendix 1, as then constituted (20 CFR 404.1520(d)).

. . . .

    3.   The claimant has not engaged in substantial gainful
    activity at any time relevant to this decision (20 CFR
    404.1594(f)(1)).

(Tr. 14).   However, the ALJ determined that Plaintiff reached

maximum medical improvement as of October 1, 2003, and that his

impairments then no longer met Listing 11.05A.   (Tr. 21.)

    Moreover, in relevant part, the ALJ further found as follows:

    4.   The medical evidence establishes that, as of October
    1, 2003, the claimant had the following medically
    determinable "severe" impairments: a seizure disorder,
    lumbar disc disease, low intellect and a memory deficit.

                    . . . .

    5.   Since October 1, 2003, the claimant did not have an
    impairment or combination of impairments which met or
    medically equaled the severity of an impairment listed in
    20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525
    and 404.1526).

                    . . . .

    9.   Based on the impairments present as of October 1,
    2003, the claimant had the residual functional capacity
    to perform light work as defined in 20 CFR 404.1567(b)
    except that he must be permitted a sit/stand option where
    he is allowed to sit for 60 minutes and then stand for
    approximately 15 minutes, is unable to engage in more
    than occasional bending, stooping and twisting and is
    unable to work around unprotected heights or dangerous
    machinery.   Additionally, considering the claimant's
    illiteracy and his other mental impairments, he is
    limited to performing simple, routine and repetitive
    tasks in a relatively low stress environment.

(Tr. 15, 17, 21-22.)   The ALJ decided that Plaintiff could not

resume his past work (Tr. 32), but that (based on relevant

considerations, including Plaintiff's residual functional capacity

                           3

("RFC") and the VE's testimony), Plaintiff could "perform a significant number of jobs in the national economy" (Tr. 23 (citing 20 C.F.R. §§ 404.1560(c), 404.1566).)  The ALJ thus concluded that Plaintiff did not have a "disability," as defined in the Act, from October 1, 2003, through the date of decision.  (Tr. 35.)

## DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits."  Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006).  However, "the scope of review of [such an administrative] decision . . . is extremely limited."  Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).  "The courts are not to try the case de novo."  Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).  Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard."  Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)).  "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted).  "If

4

there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." <u>Hunter</u>, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Social Security Commissioner]." <u>Mastro</u>, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Social Security Commissioner] (or the ALJ)." <u>Id.</u> at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996).

In confronting the issue so framed, the Court must note that "[a] claimant for disability benefits bears the burden of proving a disability," <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

5

to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[1] "To regularize the adjudicative process, the Social Security Administration has . . . promulgated . . . detailed regulations incorporating long-standing medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2

---

[1] "The Social Security Act comprises two disability benefits programs. The DIB Program . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

(1999).[2]  A finding adverse to the claimant at any of several points in the SEP ends the inquiry with a finding of no disability. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied.  The second step determines if the claimant is 'severely' disabled.  If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177.  Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." Id. at 179.[3]  Step four

_____

[2] "Through the fourth step, the burden of production and proof is on the claimant.  If the claimant reaches step five, the burden shifts to the [government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. <u>Id.</u> at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, where the ALJ must decide "whether the claimant is able to perform other work considering both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." <u>Hall</u>, 658 F.2d at 264-65. If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. <u>Hines</u>, 453 F.3d at 567.[4]

## <u>Assignments of Error</u>

In this appeal, Plaintiff argues that the Court should reverse Defendant's disability determination because the ALJ (1) failed, at step three, to properly evaluate whether Plaintiff's impairment met the requirements of 20 C.F.R. Part 404, Subpart P, Appendix I, § 12.05C ("Listing 12.05C"), (2) utilized, at step five, expert

---

[4] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. <u>See, e.g.</u>, <u>Hunter</u>, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

testimony based on unreliable data, and (3) formulated, prior to steps four and five, a mental RFC unsupported by the record. (<u>See</u> Docket Entry 16 at 7-20.) Defendant contends otherwise and urges that substantial evidence supports the determination of no disability. (<u>See</u> Docket Entry 19 at 5-20.)

## 1. **Listing 12.05C**

Plaintiff asserts that the record lacks substantial evidence to support the ALJ's determination at step three that Plaintiff failed to satisfy Listing 12.05C. (<u>See</u> Docket Entry 16 at 7-13.) Listing 12.05C states as follows:

> Mental retardation refers to <u>significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifesting during the developmental period</u>; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for the disorder is met when the requirements in A, B, C, or D are satisfied.
>
>     . . . .
>
> C. A <u>valid verbal, performance, or full scale IQ of 60 through 70</u> and a <u>physical or other mental impairment imposing an additional and significant work-related limitation of function</u>[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (emphasis added).

In other words, Listing 12.05C requires:

1) "a showing of deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22

9

(Prong 1)," <u>Hancock v. Astrue</u>, ___ F.3d ___, ___, 2012 WL 19731, at *2 (4th Cir. 2012) (internal quotation marks omitted);

2) "a valid verbal, performance, or full scale IQ of 60 through 70 (Prong 2)," <u>id.</u> (internal quotation marks omitted); and

3) "a physical or other mental impairment imposing an additional and significant work-related limitation of function (Prong 3)," <u>id.</u> (internal quotation marks omitted).

The ALJ found that Plaintiff did not satisfy Prong 1 of Listing 12.05C, which demands "a showing of deficits in adaptive functioning initially manifested during the developmental period, i.e., . . . onset of the impairment before age 22," <u>id.</u> (<u>See</u> Tr. 17-20.)[5] More specifically, the ALJ concluded that: (1) "there is no evidence that [Plaintiff] was mentally retarded before age 22" (Tr. 19); and (2) apart from the date of onset of any intellectual impairment, Plaintiff "has also failed to establish that he has the requisite deficits in adaptive functioning required to meet [Listing] 12.05C" (Tr. 20).[6]

_____

[5] Defendant "concedes that Plaintiff could satisfy the second and third prongs of [Listing] 12.05C . . . ." (Docket Entry 19 at 6.)

[6] The record directly refutes Plaintiff's suggestion that the ALJ erroneously construed Listing 12.05C as requiring Plaintiff to "produce evidence of a diagnosis of mental retardation" (Docket Entry 16 at 10). (Tr. 18 ("[M]ental retardation (MR) must have been present before age 22. This does not mean that there must be evidence in the record that the claimant was diagnosed with MR before age 22 (although this would be helpful), but there must be evidence that the claimant was functioning, both intellectually and adaptive functioning-wise, in the mental retardation range.").)

As to the first of these matters, the Fourth Circuit has taken the position that a claimant's "low IQ manifested itself in deficits in [the claimant's] adaptive behavior before age 22 . . . [where] there is no evidence that [the claimant's] IQ had changed, and [there is] evidence that [the claimant] could barely read or write . . . ." Luckey v. United States Dep't of Health & Human Servs., 890 F.2d 666, 668 (4th Cir. 1989) (emphasis added). In this case, although Plaintiff received a full-scale IQ score of 63 at age 36 (Tr. 16), the ALJ concluded that "[i]t is more than likely that [Plaintiff's] brain tumors and resultant surgeries had a negative impact on [his] IQ, which is consistent with the opinion of Mr. [John H.] Bevis, who administered the IQ test. Mr. Bevis also opined that [Plaintiff's] pre-morbid intellectual abilities were most likely in the borderline range . . . of 71-84, outside the range for mental retardation and [Listing] 12.05C." (Tr. 19.) The record thus contains substantial evidence of a reduction in Plaintiff's intellectual abilities after age 22 from a level that previously exceeded the mental retardation standard set in Listing

11

2.05C.[7]  The Court therefore should affirm the ALJ's finding that
Plaintiff did not meet Prong 1's "onset" standard.

The record also supports the ALJ's alternative determination
that, regardless of the date of onset of any intellectual
impairment, Plaintiff failed to show the deficiencies in adaptive
functioning required by Prong 1.  As courts have recognized, Prong
1 of Listing 12.05C "does not expressly define 'deficits in
adaptive functioning' . . . [but] '[a]daptive activities' are
described elsewhere in the [Mental Disorders] Listing . . . as

_____

[7]  This evidence also distinguishes this case from the only
decision besides Luckey on which Plaintiff relies.  (See Docket
Entry 16 at 12-13 (citing conclusion in Maresh v. Barnhart, 438
F.3d 897, 900 (8th Cir. 2006), that "ALJ should have found that
[claimant's] impairment manifested itself during his developmental
period" based on his "struggle[s] in special education classes
through the ninth grade, [after which he] dropped out[,] . . .
[his] trouble with reading, writing, and math[,] . . . his verbal
IQ score of 70, recorded at age 37[, and] . . . his frequent fights
with other children").)  This case also differs from Maresh in that
Plaintiff's school records do not reflect that he attended special
education classes, but do support an inference that poor effort and
spotty attendance, rather than "significantly subaverage general
intellectual functioning with deficits in adaptive functioning," 20
C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05, caused his ultimate lack
of academic success.  (See Tr. 19.)  Indeed, the ALJ observed that
Plaintiff's school records "show that [his] reading level continued
to increase most years and he often received satisfactory marks –
at least until the last year he was in school [i.e., ninth grade],
a year when he missed 20 days of school." (Tr. 20.)  Under these
circumstances, no basis exists to reverse the ALJ's finding that
Plaintiff failed to satisfy the onset requirement in Prong 1.  See,
e.g., Peoples v. Barnhart, No. SA04CA373-XR, 2005 WL 1388553, at *4
(W.D. Tex. June 8, 2005) (unpublished) ("[A] person leaving school
after completing the ninth grade, when the reasons why are unclear,
does not necessarily have deficits in adaptive functioning before
age 22.").

'cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office.'" Blancas v. Astrue, 690 F. Supp. 2d 464, 476 (W.D. Tex. 2010) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.05 and 12.00(C)(1)); accord Hager v. Astrue, No. 2:09CV1357, 2011 WL 1299509, at *2 (S.D.W. Va. Mar. 31, 2011) (unpublished).

Here, Plaintiff contends that:

> [h]e has performed only unskilled work that did not require that he read or write. He has lived with his mother, stepfather[,] or girlfriend most of his life and [has been] dependent on one or more of them all of his life. Even when he doesn't live with one of them, someone is consistently taking steps to insure that his bills are paid and that he gets to his doctor's appointments. He cannot manage his own affairs without the assistance of others.

(Docket Entry 16 at 11-12.) Notably, these allegations mention only one of the "adaptive activities" listed in the Social Security regulations, i.e., paying bills. Moreover, the record regarding Plaintiff's daily activities, work history, and social life, provides substantial evidence that conflicts with significant portions of Plaintiff's above-quoted conclusory contentions and from which the ALJ properly could find that Plaintiff failed to carry his burden of showing deficits in adaptive functioning.

In this regard, at the time of his second hearing before the ALJ, Plaintiff lived on his own and "testified that he [previously] lived with his mother because of [his] problems with seizures, not

13

because he was unable to live alone due to deficits in adaptive functioning relating to sub-average intellectual functioning." (Tr. 20.)[8]  In addition, the record reflects that Plaintiff drives, mows the lawn with a riding mower, cooks and cleans, washes his own clothes and dishes, remembers to take his medication, helps his stepfather, and enjoys fishing, canning vegetables, and visiting neighbors.  (See id.)  Plaintiff also reported to doctors that he performs routine daily activities.  (Tr. 302.)

In short, the Court also should reject the instant appeal because, even focusing only on Plaintiff's functional abilities as an adult, substantial evidence supports the ALJ's determination that Plaintiff did not show deficits in adaptive functioning as required by Prong 1 of Listing 12.05.  See Hancock, ___ F.3d at ___ & n.3, 2012 WL 19731, at *5 & n.3 (ruling that evidence that claimant had "ability to shop, pay bills, and make change; that she takes care of three small grandchildren at a level of care that satisfies the Department of Social Services; that she does the majority of her household's chores, including cooking and baking; that she is attending school to obtain a GED; and that she does

---

[8] Plaintiff's seizure activity dramatically decreased following removal of his malignant brain tumor.  (Tr. 23.)

puzzles for entertainment" sufficed to sustain ALJ's finding that claimant lacked deficits in adaptive functioning).[9]

## 2. Basis of VE's Testimony

Plaintiff next challenges the ALJ's finding that Plaintiff can perform other available work on the ground that the VE's testimony (on which the ALJ relied): (1) "[wa]s based on an unknown methodology for apportioning numbers of jobs within a census code to the various DOT titles that fit within the census code" (Docket Entry 16 at 15); and (2) "her testimony regarding the numbers of jobs for a particular DOT job title includes numbers for other DOT job titles as well" (id. at 18). These contentions lack merit.

As Plaintiff correctly points out, "the Commissioner bears the burden of providing evidence of a significant number of jobs in the national economy that a claimant can perform." (Id. at 13-14 (citing Barnhart v. Thomas, 540 U.S. 20, 25 (2003); Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002)).) In the present case, the ALJ relied on the VE's testimony that Plaintiff could do

_____

[9] Although the Fourth Circuit found these characteristics sufficient to support a finding of an absence of deficits in adaptive functioning, the Fourth Circuit did not intimate that those (or comparable) capabilities constituted the minimum necessary to uphold such a determination. See Hancock, ___ F.3d at ___ & n.3, 2012 WL 19731, at *5 & n.3. In this case, Plaintiff's capacity to perform daily tasks appears roughly comparable to the capabilities the Fourth Circuit deemed sufficient to support a finding of "no deficits in adaptive functioning" in Hancock. Accordingly, the Court need not determine where the outer boundaries lie in this area.

three jobs: (1) bench assembler (15,000 jobs in North Carolina, 387,000 jobs in the United States); (2) assembler arranger (15,500 jobs in North Carolina, 388,000 jobs in the United States); and (3) agriculture sorter (830 jobs in North Carolina, 50,000 jobs in the United States). (Tr. 33.) Although the VE gleaned these job titles and their descriptions from the Dictionary of Occupational Titles ("DOT"), a government publication, she derived the numbers of existing jobs for each title from the Occupational Employment Quarterly ("OEQ"), a private, quarterly publication from U.S. Publishing. (See Tr. 33-34.) Plaintiff claims that the VE's testimony as to job numbers lacks foundation because the VE could not describe how the OEQ takes raw census bureau data and assigns it to a particular DOT job title. (See Docket Entry 16 at 15-18.) The Court should reject this position for a number of reasons.

First, applicable regulations provide that an ALJ "will take administrative notice of reliable job information available from various governmental and other publications." 20 C.F.R. § 404.1566(d). Accordingly, "[a]n ALJ may rely on materials 'published by non-governmental entities or disseminated by subscription,' particularly where[, as here,] the published information is compiled from government sources." Jordan v. Astrue, No. 4:08CV3217, 2009 WL 3380979, at *7 (D. Neb. Oct. 21, 2009) (unpublished) (quoting Gay v. Sullivan, 986 F.2d 1336, 1340 (10th Cir. 1993) (upholding VE's use of U.S. Publishing publication

16

as source for job numbers)), aff'd, 390 Fed. Appx. 611 (8th Cir. 2010); see also Swincki v. Astrue, No. 07-13596, 2009 WL 728544, at *19 (E.D. Mich. Mar. 19, 2009) (unpublished) ("Since the [OEQ] is based on other government publications or data, of which the agency generally takes administrative notice, the ALJ reasonably relied on the VE's testimony that was based on this resource.").

Second, although Plaintiff questions the reliability of the OEQ data, he points to no other, more reliable sources of job information on which experts should rely. (See Docket Entry 16 at 15-18.) As the ALJ in this case explained, VEs often must rely on privately published job statistics, given a lack of other data:

> There apparently is no data, updated on a regular basis, available through either a public or private source, that reports numbers of jobs by DOT code number. Consequently, the vocational expert in this case, as is typical in a Social Security disability case, had to rely on the numbers given in the OEQ.

(Tr. 34; see also Tr. 633.) Plaintiff's argument thus effectively would leave Defendant with an insurmountable burden at step five in many cases. The Court should decline to set such a precedent.

Third, every court to examine the issue has affirmed the reliance on OEQ job number information in Social Security hearings, even where "the VE could not explain the precise sources for the OEQ's published information or the analysis underlying its published numbers." Jordan, 2009 WL 3380979, at *7-8 (citing "Lawrence v. Astrue, [337 Fed. Appx. 579, 586] (7th Cir. 2009)

17

('[W]e have found no issue with VEs regularly relying on the OEQ.'); <u>Liskowitz v. Astrue</u>, 559 F.3d 736, 744 (7th Cir. 2009) (stating the OEQ 'does indeed seem to be a source on which VEs customarily rely'); <u>Jones v. Astrue</u>, [No. 3:06CV939], 2008 WL 4552478, [at *]23 (M.D. Tenn 2008) (affirming an ALJ decision relying on a VE's job number testimony where the VE explained the numbers came 'from the Department of Labor ultimately, but as crunched, if you will, by the U.S. Publishing in its document, The Employment Statistic Quarterly.')"); <u>accord</u> <u>Brault v. Social Sec. Admin., Comm'r</u>, No. 1:10CV112, 2011 WL 1135014, at *3 (D. Vt. Mar. 24, 2011) (unpublished); <u>Pritchett v. Astrue</u>, No. 5:09cv144, 2009 WL 4730326, at *6 (M.D. Ga. Dec. 4, 2009) (unpublished).

Finally, Plaintiff has offered no effective rebuttal to the ALJ's explanation that:

> [V]ocational experts . . . are not puppets who are expected to simply restate the information given by one source. They are experts who are expected to be familiar with job markets, and who read newspapers, magazines, professional publications, and the like, all of which report on matters concerning employment and jobs.

(Tr. 34.) In other words, no basis exists to conclude that the VE unreasonably relied on the OEQ in this case. Accordingly, the ALJ did not err by relying on the VE's testimony.

The Court also should reject Plaintiff's request for reversal based on the related argument that "the figure [from the OEQ the VE] cited for each job was not limited to the specific DOT job

18

title but also included other DOT job titles." (Docket Entry 16 at 18.) This claim arises from the method U.S. Publishing uses to match a given Census code to a particular DOT job title, thereby creating an estimate of the number of jobs in that category. Because this estimate may include not only the occupational sub-category cited by the VE, but other sub-categories as well, Plaintiff argues that the OEQ provides insufficient evidence of the job numbers for each sub-category.

To the extent Plaintiff's contentions in this regard constitute another blanket attack on the use of the OEQ by a VE, his claim fails for reasons previously discussed. Moreover, a showing that the OEQ's job numbers fail to match individual DOT job titles does not require reversal in this case. Plaintiff's instant contention hinges on the assumption that, if Census codes perfectly aligned with particular DOT job titles, as cited by the VE, the representative number of jobs for those titles would drop below the necessary level. The record does not support such speculation.

For example, acceptance of Plaintiff's claim that "the number of bench assembler positions in North Carolina is probably much less than 15,000 jobs," (Docket Entry 16 at 19), would not alter the outcome of his case. Even reducing the jobs for each particular DOT title in each OEQ category to a tenth of the total number cited would leave a significant number:

19

> In Hall v. Bowen, 837 F.2d 272, 275 (6th Cir. 1988), the
> Sixth Circuit found 1,350 positions were a significant
> number of jobs.  In Barker v. Secretary of Health & Human
> Services, 882 F.2d 1474, 1479 (9th Cir. 1989), the Ninth
> Circuit found 1,266 positions were within the parameters
> of a significant number of jobs.  The Tenth Circuit,
> while refusing to draw any bright line, found 850-1,000
> potential jobs were a significant number of jobs in
> Trimiar v. Sullivan, 966 F.2d 1326, 1330-32 (10th Cir.
> 1992).  See also Jenkins v. Bowen, 861 F.2d 1083, 1087
> (8th Cir. 1988) (500 jobs are significant number); Allen
> v. Bowen, 816 F.2d 600, 602 (11th Cir. 1987) (174
> positions are significant number); Nix v. Sullivan, 744
> F. Supp. 855, 863 (N.D. Ill. 1990) (675 jobs are
> significant number), aff'd, 936 F.2d 575 (7th Cir. 1991).

Lee v. Sullivan, 988 F.2d 789, 794 (7th Cir. 1993).

In sum, the record, as a whole, contains substantial evidence to support the ALJ's decision regarding available jobs.

## 3.  Mental RFC

In his third and final claim, Plaintiff contends that "substantial evidence does not support the ALJ's rejection of limitations related to Plaintiff's memory, attention span[,] and toleration of stress."  (Docket Entry 16 at 19.)  His argument to this effect, set out in its entirety, appears as follows:

> Mr. Bevis determined that [Plaintiff's] "immediate and
> delayed memory functions appear to be significantly
> impaired," that his "attention span was adequate to
> perform simple repetitive tasks for short periods of
> time," but that his low intelligence and memory deficits
> would cause significant problems relating to coworkers
> and supervisors and significantly interfere with work
> performance. (Tr. 364, 365) The VE testified that with
> these limitations, [Plaintiff] would be unable to work.
> It was error for the ALJ to reject these limitations
> since there was no evidence in the record to contradict
> them.  At step 5, the Commissioner bears the burden of
> proving the claimant can perform other work.  Without

20

substantial evidence to contradict Mr. Bevis's conclusions, [Plaintiff] should be awarded benefits based on the VE's testimony.

(Id. at 19-20.)

If the record lacked any basis to question Mr. Bevis's proffered limitations, as Plaintiff contends, the Court would have no choice but to agree with Plaintiff's foregoing conclusions. The record, however, contains significant medical and other evidence contradicting Mr. Bevis's opinion on these points and the ALJ discussed this evidence at length. The relevant medical evidence, as summarized in the ALJ's decision, consisted of the following:

> Around 2003 was the first time [Plaintiff] mentioned memory problems to any of his doctors. His regular and ongoing interactions with his neurologists, oncologists[,] and orthopedists have for the most part been absent of reports or evidence of memory, concentration, social[,] or adaptive problems. When [Plaintiff] saw Dr. Stieber in March 2003, he did not complain of any memory or concentration problems. In fact, when Dr. Chen examined [Plaintiff] only about 2 months earlier than Mr. Bevis, Dr. Chen observed that [Plaintiff] was oriented to person, place[,] and time and appeared to be a reliable historian. There was no objective evidence of any social, memory[,] or concentration deficits, despite [Plaintiff's] subjective complaints of decreased short-term memory. Although [Plaintiff] complained of poor short-term memory when he saw Dr. Stieber in June 2004, the doctor noted no objective finding which supported this complaint. Furthermore, in May 2007, Dr. Glazier reported that [Plaintiff] denied any confusion or mental problems.

(Tr. 30-31.) Plaintiff's ability to perform myriad daily activities provided the ALJ with an additional basis for discounting Mr. Bevis's opinions in this regard. (See Tr. 31.)

21

Substantial evidence thus supports the ALJ's decision to exclude the limitations Plaintiff seeks to have incorporated into his RFC and to conclude that, although Plaintiff suffers memory deficits, they do not prevent him from working. (See Tr. 31-32.)[10]

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Summary Judgment (Docket Entry 15) seeking a reversal of the Commissioner's decision be **DENIED**, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 18) be **GRANTED**, and that this action be dismissed with prejudice.

_____
/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

Date: April 16, 2012

_____

[10] Moreover, the ALJ reasonably concluded that Mr. Bevis's own findings do not fully support his conclusions:

> [M]emory function test results . . . showed only moderate impairments of [Plaintiff's] immediate and delayed response memory. Additionally[, Plaintiff] took the WAIS-III and the WSM-III, and underwent a clinical interview in one setting. According to its publisher, the WAIS-III takes about 60 to 90 minutes, and the WSM-III takes about 30 minutes. Mr. Bevis' report makes no mention of [Plaintiff] having to take extra breaks or . . . being unable to complete either of the tests or the interview because of lack of ability to concentrate or to attend to the requested tasks.

(Tr. 30.)